UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                     :
UNITED STATES OF AMERICA             :
                                     :
         -v.-                        :
                                     :    09 Cr. 799 (RWS)
BRIAN H. MADDEN,                     :
                                     :
              Defendant.             :
                                     :
------------------------------------x

## GOVERNMENT'S SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States
    of America

AVI WEITZMAN
Assistant United States Attorney

    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA        :

    -v.-        :

                                                         :        09 Cr. 799 (RWS)

BRIAN H. MADDEN,        :

                Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum for the Court's consideration in connection with the sentencing of the defendant Winifred Jiau. The Government respectfully submits that the stipulated Guidelines range is 41 to 51 months' imprisonment, and that a sentence within that range is appropriate and "sufficient, but not greater than necessary, to comply with the purposes" of sentencing under 18 U.S.C. § 3553(a)(2).

On or about December 14, 2010, Brian Madden pled guilty to Counts One and Three of Indictment 09 Cr. 799 (RWS). Those counts charged that from at least in or about 2008, through in or about April 2009, Madden participated in a wire fraud scheme in violation of Title 18, United States Code, Section 1343 and 2 (Count One) and embezzled and misappropriated money held by an insurance agent, in violation of 18 U.S.C. §§ 1033(b)(1)(A) and 2. The plea agreement included a stipulated Guidelines sentence of 41 to 51 months. While the Probation Office has concluded that the applicable Guidelines range is higher and should be 63 to 78 months' imprisonment, the Government intends to stand by its plea agreement and is seeking a sentence within the stipulated Guidelines range.

1

I.   **Background**

Brian Madden was one of the founders and the president of Liberty Title Agency, LLC ("Liberty Title"), a title insurance agent founded in or about 2002 that maintained offices both in Uniondale, New York, and New York, New York. Prior to its demise in or about April 2009, Liberty Title was one of the largest independently-owned title insurance agents in New York State. As a title insurance agent, Liberty Title issued title insurance policies on behalf of several underwriters in connection with commercial and residential real estate transactions, primarily in the Northeastern United States.

In addition to operating Liberty Title, Madden also operated two other title insurance agencies: Skyline Title, LLC ("Skyline Title") and GNY Liberty Abstract, LLC ("GNY Liberty"). Both of these title insurance agencies are joint venture entities, of which Liberty Title's parent company, Liberty Agency Holdings, LLC ("Liberty Agency"), was a joint venture partner. Liberty Title was appointed to function as the manager of Skyline Title and GNY Liberty, meaning that Liberty Title was retained to provide title insurance services to both Skyline Title and GNY Liberty. Indeed, the operating agreement for GNY Liberty named Madden as the President and chief executive officer of GNY Liberty. Thus, Madden managed the day-to-day business operations and affairs of both Skyline Title and GNY Liberty, including the banking and accounting affairs of these companies.

In or about February 2009, several of Liberty Title's underwriters received anonymous notes warning the underwriters of certain malfeasance at Liberty Title. As a result, the underwriters commenced an audit of Liberty Title. While the audits did not initially reveal any illegal activities, by April 2009, it was discovered that Madden had misappropriated $500,000 in escrow funds that had been entrusted to Liberty Title by Extel West 57th LLC in February 2009.

2

Word of this misappropriation quickly spread, the underwriters cancelled their agency contracts with Liberty Title, and by early April 2009, Liberty Title was forced to close down.

In the federal investigation that proceeded, it was discovered that, beginning at least in or about April 2008, Madden began to embezzle and misappropriate hundreds of thousands of dollars from Liberty Title, Skyline Title and GNY Liberty in order to sustain the operations of Liberty Title, as well as his significant draws (or advances on compensation) from Liberty Title. In particular, Madden misappropriated escrow and client funds that were entrusted to Liberty Title, Skyline Title, and/or GNY Liberty for a particular purpose -- such as to pay real estate taxes or a deposit on a transaction or to satisfy the recording fees in connection with a real estate transaction -- in order to pay off unrelated debts, such as debts that were due on behalf of other clients. Liberty Title did not have the money to pay those debts, as it should have, because, beginning at least as early as January 2008, Madden began taking significant and excessive draws from Liberty Title. As a result, many of Liberty Title's clients defrauded of millions of dollars. Indeed, the parties have stipulated in the plea agreement that the loss that was reasonably foreseeable to the defendant was more than $1 million and less than $2.5 million.[1] In addition to the losses to the Title Insurance companies, Liberty Title failed to record dozens of real estate transactions and mortgages that it had been hired and paid to record. As a result, the title insurance companies have had to pay to record some of these mortgages.

Several examples of the defendant's fraudulent conduct are detailed in the complaint against Madden and in the PSR. One such example is the large real estate transaction on the Upper West Side of Manhattan. More specifically, on or about December 2, 2008,

---

[1] As determined by the Probation Department, the actual losses incurred by victims is estimated to be approximately $4.7 million. (PSR ¶ 46).

EXTEL/IMICO West End LLC ("EXTEL/IMICO"), a large New York City developer, wired to Liberty Title millions of dollars in connection with the closing of a real estate transaction involving property located at 531-533 West End Avenue in Manhattan, New York (the "West End Transaction"). Among other fees, EXTEL/IMICO's wire transfers included more than $2.1 million for Liberty Title to pay off mortgage real estate taxes in connection with the transaction and to record the transaction with the New York County clerk. Rather than use the funds for the purpose intended, Madden instead used the funds for unrelated purposes. By late February 2009, when Madden ultimately authorized the issuance of an approximately $2.1 million check for the payment of the real estate taxes and recording fees, Liberty Title lacked sufficient funds to cover the check. Therefore, Madden transferred to Liberty Title approximately $375,000 from Skyline Title's bank account and $525,000 from GNY Liberty's bank account to cover the shortfall, without first obtaining the necessary authorizations. Madden also used, without proper authorization, approximately $500,000 of escrow funds entrusted to Liberty Title by another Extel entity (EXTEL West 57th LLC) to pay a portion of the shortfall needed to cover the approximately $2.1 million check.

As noted above, a large part of Liberty Title's cash shortfall is attributable to the large draws from Liberty Title that Madden unilaterally took to support his lifestyle and philanthropic activities. For example, in the first few years that Liberty Title did business, from in or about 2002 through 2005, the cash draws to Madden never exceeded more than $550,000 a year. However, in the years thereafter, Madden unilaterally took cash draws approaching $1.5 million a year, and more. Indeed, in the approximately 15 months between January 1, 2008 and early April 2009 (when Liberty Title shut down), Madden took cash draws of approximately $2.2 million from Liberty Title. Even as the real estate market declined in 2008 and Liberty Title's

business deteriorated, Madden's cash draws from the company increased. For example, during the first nine months of 2008, Madden took significant cash draws, including approximately $340,000 in July 2008 and over $275,000 in August 2008. These large cash draws were used to sustain Madden's expensive lifestyle, which included owning at least 4 homes and/or parcels of land in Manhattan, Long Island, and the Hamptons. As a result, Madden was necessarily taking client funds and using them for his own purposes.

## II.   Consideration of the 3553(a) Factors

In determining a reasonable sentence, the sentencing judge is required to consider the factors set forth at 18 U.S.C. § 3553(a). These factors include, among others, (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (3) the need for afford adequate deterrence to criminal conduct; and (4) the need to avoid unwarranted sentence disparity. *See* 18 U.S.C. § 3553(a)

Madden's criminal conduct warrants a sentence within the stipulated Guidelines range of 41 to 51 months' imprisonment. In engaging in the criminal conduct described above, Madden acted with extreme arrogance, greed, and a callous disregard to the interests of his clients who entrusted him with their money. Like many Ponzi schemes, Madden essentially robbed Peter to pay Paul: he took money that rightfully belonged to one client or business partner to cover the debts Liberty Title incurred with other clients whose funds he fraudulently depleted. While some of those defrauded clients were large real estate companies such as Extel (PSR ¶¶ 24-30), others were charitable religious institutions like the Watchtower Bible and Tract Society of New York, Inc. (PSR ¶¶ 31-33). As the Watchtower Society described in its victim-impact statement, Madden's theft of $500,000 from Watchtower has prevented Watchtower from using donated

funds for their intended purpose of acquiring property for places of religious worship, production of religious literature for distribution, and maintenance of the World Headquarters of Jehovah's Witnesses. Many of his clients expressly requested that the funds entrusted to Madden be safeguarded in an escrow account. But Madden, ignoring such instructions, abused the trust placed in him and used the money for unrelated purposes.

Reading the defendant's sentencing submission in this case, this Court would think Mr. Madden a near-Saint with an "abiding devotion to family, friends and community" and a long history of donating to charitable causes works and acts of generosity. Most respectfully, that is not the picture painted by his actions in this case. The simple truth is that Madden, in utter disregard for his role and duties as a fiduciary and insurance agent, co-mingled fiduciary funds with his general operating funds and then spent the moneys provided to him as a fiduciary to fund some of his business operations and charitable works. Far from a one-time or isolated event, Mr. Madden's fraudulent conduct here reveals a long-term and repeated disregard for his legal obligations as a fiduciary insurance agent. Month after month, Madden deceived his clients and the insurance companies that trusted him, all in an effort to keep his failing company afloat and ensure that Madden continued to receive substantial draws from his company.

Madden's fraudulent conduct in this case was the height of arrogance. When the insurance companies began to question him about his financial transactions, Madden began his cover up, repeatedly deceiving those insurance companies and lulling them into believing that he was playing by the book. As Stewart Title Insurance Company ("Stewart Title") described in its victim-impact letter, Madden engaged in "misdirection and subterfuge" in order to prevent discovery of his fraudulent acts. A similar pattern of deception and lies is described in the victim-impact letter submitted by Commonwealth Land Title Insurance Company

6

("Commonwealth Insurance"). Even after suspicions were raised with Madden in early 2009 about Madden's conduct, Madden continued to take substantial draws from his company, depleting the company of valuable additional assets that could have been used to repay his victims. For example, on January 27, 2009, Madden took a draw of $200,000 from Liberty Title, followed by a draw of $125,000 on February 27, 2009, and a draw of $100,000 on March 10, 2009. Indeed, after those substantial draws, and undoubtedly recognizing that his fraudulent actions would result in civil lawsuits and possibly criminal charges as well, Madden tried to hide substantial assets, moving hundreds of thousands of dollars out of bank accounts controlled by him and his wife into bank accounts controlled by his college-age daughter.[2] And, as discovered in a court-authorized search of his residence on or about May 19, 2009, over $94,000 in bulk cash was secreted under a chair used by an aging relative, and another approximately $14,000 was hidden in a cookbook.

Once discovered and sued by the very victims he cheated, Madden continued to show an utter lack of remorse, as well as contempt for the civil legal process. For example, at sworn civil depositions, Madden repeatedly displayed his middle finger to the victims' counsel while invoking his 5th Amendment rights, as detailed in the victim-impact letters submitted by Stewart Title and Commonwealth Insurance. Furthermore, despite the fact that Madden fully admits that the company he owned and controlled co-mingled and fraudulently used the $500,000 entrusted to it by the Watchtower Society, he continues to contest his personal liability for that loss,

---

[2] For example, on or about March 16, 2009, two cashier's checks drawn from accounts held in the name of Madden's wife were deposited into an account at Bank of America in the name of Madden's daughter. The two cashier's checks were in the amount of $125,295.75 and $100,000. Subsequently, in two transactions on or about March 20 and March 24, 2009, Madden's daughter withdrew approximately $225,000 in cash from her account.

despite the fact that his malfeasance was the cause of that loss. Other than his guilty plea in this case, which took approximately 19 months for him to finally enter, Madden has shown a remarkable pattern of recalcitrance and an surprising lack of remorse for certain of his own criminal conduct.

Finally, Madden's sentencing memorandum makes a feeble attempt to claim that the Guidelines calculation in this case overstates the seriousness of his fraudulent conduct, relying primarily on Judge Rakoff's decision in *United States* v. *Adelson*, 441 F.Supp.2d 50 (S.D.N.Y. 2006), to claim that the Guidelines have "run amok." While Madden would have the Court believe that *Adelson* was a run-of-the-mill, white-collar fraud case, *Adelson* was anything but, and is entirely inapposite here. *Adelson* concerned the sentence to be imposed on the President of Impath, Inc., a public company specializing in cancer diagnosis, for securities fraud based on accounting irregularities. *Id.* at 507-08. Adelson had joined the conspiracy at its tail-end, and the loss amount in that case was a measure of the "decline in the price of a stock when the fraud [was] revealed." *Adelson*, 441 F.Supp.2d 500. As a result, given the fact that Impath was a successful public company that had issued over 16 million shares of common stock, the accounting fraud conspiracy that the defendant had joined resulted in a loss to Impath's shareholders of approximately $260 million. *Id.* at 509. Judge Rakoff thus believed that strict application of the Guidelines would result in a "travesty of justice" given the huge losses in the market. *Id.* at 515. Whatever the merits of Judge Rakoff's arguments for a below-Guidelines sentence in the context of a securities fraud case, the arguments raised in *Adelson* are inapposite in this case, where the defendant engaged in repeated fraudulent conduct over the course of several months and the losses are not in the hundreds of millions of dollars. Unlike a securities and accounting fraud case, where a momentary lapse of judgment or bit of "fuzzy math" can

yield losses of hundreds of millions or even billions of dollars, the defendant's losses are not disproportionate to his criminal conduct.

### III. Conclusion

For the foregoing reasons, the Government respectfully submits that a sentence within or the stipulated Guidelines sentencing range of 41 to 51 months is appropriate and necessary to reflect the seriousness of Madden's offenses, to promote respect for the law, to provide just punishment, to afford adequate deterrence to Madden and others, and to avoid unwarranted sentencing disparities.

Dated: New York, New York
September 13, 2011

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York

By: _____
Avi Weitzman
Assistant United States Attorney
(212) 637-1205

cc: Frederick Hafetz, Esq. (By ECF and e-mail)

9