UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

against

BRIAN H. MADDEN,

Defendant.

09 CRIM. 799 (RWS)

# REPLY MEMORANDUM TO THE GOVERNMENT'S SENTENCING MEMORANDUM

Frederick P. Hafetz (FH1219)
Noah E. Shelanski (NS 4800)
Isil Yildiz (IY 7796)
Hafetz Necheles & Rocco
500 Fifth Avenue, 29th Floor
New York, New York 10110

*Attorneys for Defendant Brian Madden*

Defendant Brian Madden respectfully submits this memorandum in reply to the government's sentencing memorandum dated September 13, 2011 ("Government Memorandum").

Mr. Madden submitted a sentencing memorandum dated May 17, 2011 ("Madden Memorandum") explaining why under 18 U.S.C. § 3553(a) a variance below the sentencing guidelines to a non-custodial sentence was appropriate due to the extraordinary contributions that Mr. Madden has made to his community and charitable causes, the aberrational nature of his offense, and because the sentencing guidelines overstate the seriousness of Mr. Madden's conduct. The Government Memorandum fails to address the core arguments in the Madden Memorandum for a variance, and to the extent those arguments were not addressed by the government they will not be reargued here. However, the government's sentencing submission makes several broad and erroneous assertions that are in need of correction: (1) that Mr. Madden's "draws" from the Liberty Title Agency ("Liberty") were an integral part of the offense for which Mr. Madden pleaded guilty; (2) that Mr. Madden's offense was part of a pattern of criminal conduct by Mr. Madden; (3) that Mr. Madden lacks remorse for his offense; and (4) that the guidelines do not overstate the seriousness of Mr. Madden's conduct and that Mr. Madden's lifetime of charity and commitment to others should be ignored.

1. **Mr. Madden's Draws From Liberty Were Proper**

Mr. Madden founded Liberty in 2002 as an 85% owner of the company and he quickly grew it into the largest independent title insurance agency in the region. Mr. Madden drew a relatively modest salary with the hope and expectation that he would be further compensated out of Liberty's profits. As Liberty's business and profits grew year after year, Mr. Madden was

1

able to take greater compensation in the form of "draws." The Government Memorandum suggests that there was something improper with Mr. Madden taking draws and increasing the size of those draws as the business grew. There was not. This was money that Mr. Madden was entitled to as the owner of a profitable business, and he paid all taxes owed on the draws. Although Mr. Madden took draws in excess of $1 million in 2006 and 2007, Liberty remained solvent because its business was so strong. Indeed, after handling the closing on the Chrysler Building in August 2008, Liberty was not only solvent; it was in the best financial condition ever notwithstanding Mr. Madden's compensation.

The government argues that Mr. Madden took "significant and excessive draws" starting in 2008 and that "as a result, Liberty's clients were defrauded of millions of dollars." (Government Memorandum, p. 2). This is a fallacious argument. While it is true that Mr. Madden took draws of approximately $2.5 million from Liberty between January 2008 and April 2009 (when Liberty ceased operations), ignored by the government are the facts set forth in the Madden Memorandum, showing that during this time period Mr. Madden put more than $2.4 million back into Liberty. (Madden Memorandum, p. 39; Exhibit 38 to the Madden Memorandum). Also ignored by the government is the fact that much of the money put into Liberty by Mr. Madden during this time period was the result of substantial personal liability incurred by Mr. Madden and his wife from bank loans obtained by them. Accordingly, the government argument that Mr. Madden's "greed" caused Liberty's clients to be defrauded, is unsupported by the facts.

The government states that Mr. Madden took $425,000 in draws from Liberty in January – March 2009, inferring that he tried to hide this money from creditors by transferring it to his daughter or by hiding it in cash in his home. (Government Memorandum, p. 7). This is

2

erroneous for two reasons. First, although Madden took draws exceeding $400,000 during January – March 2009, he returned to Liberty over $1 million during this same time period. (Madden Memorandum, Exhibit 38).

| REDACTED | REDACTED | REDACTED | REDACTED |
|---|---|---|---|
| REDACTED | REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED | REDACTED |

### 2. Mr. Madden's Offense Conduct Was Aberrational

The government depicts Mr. Madden as a persistent fraudster who ran Liberty like a "Ponzi" scheme that "robbed Peter to pay Paul." (Government Memorandum, p. 5). The government assertion is completely unfounded. A criminal running a Ponzi scheme takes money from the business which is *never* solvent, because the business can never pay off all of its obligations to all of its investors or creditors. As explained more fully in the Madden Memorandum at pp. 18-22, Liberty was a hugely profitable and completely solvent business until the fall of 2008 when the real-estate market collapsed, notwithstanding the draws that Mr. Madden had taken from Liberty. However, because of the real-estate collapse and because of Liberty's failure to adequately account for its client's assets and obligations, Liberty expended client funds for operating expenses *unbeknownst* to Mr. Madden. Indeed, even as late as early-February 2009 during the audits of Liberty referred to in the victim-impact letters of Stewart Title and Commonwealth Insurance (*see* Government Memorandum pp. 6-7), Mr. Madden was

---

| REDACTED | REDACTED | REDACTED | REDACTED |
|---|---|---|---|
| REDACTED | REDACTED | REDACTED | REDACTED |

unaware that Liberty had insufficient funds to meet all of its obligations to its clients from the assets it held on behalf of those clients.

While Liberty's accounting failure was undoubtedly a civil wrong against its clients, it was not a criminal violation by Mr. Madden. Mr. Madden's criminal offense did not occur until late-February 2009 when he knowingly used client escrow funds and related-company assets to cover a portion of a $2.1 million client obligation on the unrelated Extell/IMICO transaction. Immediately recognizing his actions as wrongful, Mr. Madden tried unsuccessfully to cancel the check that he wrote to cover the Extell/IMICO obligation. These were not the actions of a career criminal; they were the desperate aberrational actions of a man trying to save his company. Liberty's accounting failure caused the shortfall in funds that led to Mr. Madden's criminal act, but there was no pattern of Mr. Madden criminally violating his fiduciary duty to his clients.

### 3. Mr. Madden Regrets His Conduct

The government wrongfully asserts that Mr. Madden has shown an "utter lack of remorse" for his victims. (Government Memorandum pp. 7). The government points to Mr. Madden's supposed contempt for civil claimants against him related to Liberty's collapse. However, that a defendant asserted his Fifth Amendment rights on the advice of counsel during a civil case deposition in a lawsuit against both his wife and him while criminal charges are pending against him is simply not a factor against him at sentencing. Nor, unsurprisingly, does the government cite any authority for this proposition. And while it may have been ill-advised for Mr. Madden to display a rude gesture to plaintiffs' counsel during a civil deposition, the catalyst for this response was a highly aggressive, caustic cross-examination of a man who has dedicated his life to building a reputation for integrity in business and charitable activities.

Nor is the length of time between Mr. Madden's arrest and guilty plea an indication of his lack of remorse. The 19 months between Mr. Madden's arrest and guilty plea reflects that Mr. Madden and his wife Elizabeth were being sued by no less than eight separate entities in connection with Liberty's collapse, and that an asset freeze order in one of those cases presented significant barriers to working out a forfeiture agreement between Mr. Madden and the government while still allowing Elizabeth Madden – an innocent party – sufficient assets to settle the cases against her. Mr. Madden has since settled many of the civil cases against him, and significantly, he has agreed to confessions of judgment that are non-dischargeable in bankruptcy.

Additionally, Mr. Madden has given up *all* of his assets, and a substantial portion of his wife's assets, in forfeiture and has agreed not to appeal any restitution amount of up to $4.7 million – a sum far in excess of his guidelines loss amount of $1 million to $2.5 million – in the recognition that many parties – such as the Watchtower Bible and Tract Society – were hurt by Liberty's collapse even though Mr. Madden is not criminally liable for those parties' losses. Demonstrating his remorse, Mr. Madden has agreed to restitution to compensate even those indirectly impacted by his criminally conduct.

Further evidence of Mr. Madden's remorse is found in the letter from James P. Truitt, attorney for Stewart Title, thanking Mr. Madden for his assistance in preparing Stewart Title's complaint against Mr. Madden's former business partner Albert Yorio. (Madden Memorandum Exhibit 26). Mr. Madden lent his assistance to Stewart Title because he knew it was the right thing to do, even though he was under no obligation to do so.

### 4. The Government Ignores Established Sentencing Jurisprudence

In its zeal to have a guideline sentence imposed on Mr. Madden, the government virtually ignores the post-*Booker* sentencing jurisprudence set forth in Mr. Madden's sentencing memorandum.

Unaddressed by the government is our analysis in the Madden Memorandum (pp. 5-9) of how the fraud loss tables reflected in the 41-51 month sentencing guideline calculation in the plea agreement represents a ratcheting up of the fraud loss tables since the advent of the guidelines without regard to empirical basis and the national experience. Ignored by the government is the Supreme Court teaching that sentencing courts have the discretion to disagree with the guidelines on policy grounds. (Madden Memorandum, pp 7-8). *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).

Further, the government fails to recognize that in the post-*Booker* sentencing world, the guidelines are "advisory," *Kimbrough*, at 101, and "are only one of the factors to consider when imposing sentence." *Gall v. United States*, 552 U.S. 38, 59 (2007).

Based on this flawed approach to post-*Booker* sentencing, in disregard of the wide discretion accorded to sentencing courts post-*Booker*, *U.S. v Jones*, 531 F.3d 163, 172. (2nd Cir. 2008), the government dismisses Mr. Madden's extraordinary lifetime of charitable work and devotion to others (Government Memorandum, p.6) as meaningless because he committed a crime. We understand that he committed a crime. That is why he is being sentenced. The government approach contravenes the "individualized assessment" that sentencing judges must make to avoid the "mathematical" rigidity of the guidelines. *Gall*, at 50.

6

## CONCLUSION

For the foregoing reasons and the reasons set forth in the Madden Memorandum, we respectfully submit that the minimum sentence necessary but sufficient to satisfy the requirements of 18 U.S.C. § 3553(a) is a non-custodial sentence for Mr. Madden.

Dated:   September 16, 2011
         New York, New York

Respectfully submitted

_____
Frederick P. Hafetz (FH1219)
Noah E. Shelanski (NS 4800)
Isil Yildiz (IY 7796)
Hafetz Necheles & Rocco
500 Fifth Avenue, 29th Floor
New York, New York 10110
212-997-7595
fph@hnrlawoffices.com
nes@hnrlawoffices.com
iyildiz@hnrlawoffices.com

*Attorneys for Defendant Brian Madden*