UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

     - against -

BRIAN H. MADDEN,

          Defendant.

------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9|19|11

09 Cr. 799-01 (RWS)

SENTENCING OPINION

**Sweet, D.J.**

       On December 14, 2010, Brian H. Madden, ("Madden" or
"Defendant") pleaded guilty to one count of wire fraud, in
violation of 18 U.S.C. § 1343 and one count of insurance fraud,
in violation of 18 U.S.C. § 1033(b)(1)(A).  For the reasons set
forth below, Madden will be sentenced to 41 months' imprisonment
to be followed by 2 years' supervised release.  Madden will also
pay restitution and forfeit certain assets and will be required
to pay a special assessment of $200.

**Prior Proceedings**

       On August 19, 2009, Indictment 09 CR 799-01 (RWS) was
filed in the Southern District of New York.  Count 1 charges

1

that from 2008 until April 2009, in the Southern District of New York and elsewhere, Madden fraudulently misappropriated escrow and other client funds which were supposed to have been maintained by several title insurance agencies he operated, which funds he used for, among other things, his own personal enrichment and to pay other, unrelated business expenses, and in the course of executing this scheme he caused interstate wire transfers to be made, in violation of 18 U.S.C. § 1343.  Count 2 charges that from 2008 until April 2009, in the Southern District of New York and elsewhere, Madden conspired with others to conduct financial transactions which involved proceeds of the wire fraud scheme alleged in Count 1, by effecting wire transfers of funds from Liberty Title's bank accounts to Skyline Title and executing checks and other monetary transactions on behalf of Liberty Title, all of which were designed to conceal the fact that the funds had been misappropriated from Skyline Title, GNY Liberty, and/or the escrow accounts of several of Liberty Title's clients, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Count 3 charges that from 2008 until April 2009, in the Southern District of New York and elsewhere, Madden misappropriated and embezzled several million dollars of escrow and other client funds that had been entrusted to three title insurance agencies that he operated and controlled, which funds

2

he used for, among other things, his own personal enrichment to pay other, unrelated business expenses, in violation of 18 U.S.C. § 1033(b)(1)(A).

On December 14, 2010, Madden appeared before the Honorable Henry B. Pitman in the Southern District of New York and pleaded guilty to Counts 1 and 3 pursuant to a plea agreement.

On May 17, 2011, the Court received a memorandum from Defendant requesting that the Court be lenient when imposing a sentence in light of Madden's personal characteristics and the nature of his offense conduct.  On September 13, 2011, the Court received a memorandum from the Government encouraging the Court to sentence Madden within range set forth in the plea agreement. On September 16, 2011, Defendant submitted a reply to the Government's sentencing memorandum.

Madden's sentencing is currently scheduled for September 20, 2011.

3

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Guidelines. Thus, the sentence to be imposed here is the result of a consideration of:

    (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)  the need for the sentence imposed —

        (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)  to afford adequate deterrence to criminal conduct;

        (C)  to protect the public from further crimes of the defendant; and

        (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3)  the kinds of sentences available;

    (4)  the kinds of sentence and the sentencing range established for —

        (A)  the applicable category of offense committed by the applicable category of defendant as

4

set forth in the guidelines . . .;

(5)   any pertinent policy statement . . . [issued
      by the Sentencing Commission];

(6)   the need to avoid unwarranted sentence
      disparities among defendants with similar
      records who have been found guilty of
      similar conduct; and

(7)   the need to provide restitution to any victims of
      the offense.

18 U.S.C. § 3553(a).  A sentencing judge is permitted to find

all the facts appropriate for determining a sentence, whether

that sentence is a so-called Guidelines sentence or not.  See

Crosby, 397 F.3d at 114-15.


**The Defendant**


        The Court adopts the facts set forth in the

Presentence Investigation Report ("PSR") with respect to

Madden's personal and family history.


**The Offense Conduct**


        The following description draws from the PSR.  The

specific facts of the underlying conduct are adopted as set

forth in that report.

The following investigation was conducted by the FBI and the New York State Department of Insurance.

In 2002, Madden co-founded Liberty Title, a title insurance agency with offices located in Uniondale, New York, and Manhattan. Liberty Title was one of the largest independently-owned title insurance agencies in New York State. Madden was majority owner of Liberty Title, and he also operated two other title insurance agencies: Skyline Title, LLC, and GNY Liberty Abstract, LLC. Liberty Title was the parent company of both Skyline Title and GNY Liberty and provided title insurance services to both agencies. Madden managed the day-to-day business operations and affairs of both Skyline Title and GNY Liberty, including the banking and accounting affairs of these companies.

Title insurance is sold to purchasers of property or lenders financing the purchase of property, and it is supposed to protect the owner's or lender's financial interest in real property against loss due to title defects, liens, or other defects in title to property. Underwriters authorize title insurance agents to issue policies on their behalf. Title

6

insurance agents are entrusted with client funds to be held in
escrow for a period of time, including funds intended as deposit
in connection with a real estate transaction.

As a title insurance agent, Liberty Title issued title
insurance policies on behalf of several underwriters in
connection with commercial and residential real estate
transactions, primarily in the Northeastern United States.

In April 2009, after an underwriter's discovery of
certain accounting and financial irregularities at Liberty
Title, the company closed down after several of its agency
contracts with underwriters were terminated.

Part of Madden's duties while managing Liberty Title,
Skyline Title and GNY Liberty was to segregate and maintain the
escrow and client funds of all three companies.  Madden
fraudulently commingled these monies and used such funds for his
own purposes.  Madden caused millions of dollars of escrow and
other funds to be transferred between and among various bank
accounts held by Liberty Title, Skyline Title, and GNY Liberty
into other accounts used by Liberty Title in order to sustain
Liberty Title's operations.  Madden also used new escrow and

7

other funds provided by clients of Liberty Title, Skyline Title and GNY Liberty to pay off debts owed on behalf of other clients whose funds Madden had misappropriated.  Lastly, Madden withdrew several million dollars from Liberty Title's bank accounts, in the form of advances on compensation, for his personal use. Even after Liberty Title's severe financial condition became apparent, Madden continued to take significant cash withdrawals from Liberty Title; specifically, in the month prior to Liberty's demise, Madden withdrew approximately $20,000 from Liberty's account and transferred the money into his and his family members' accounts.

Because Madden misappropriated funds provided by clients of Liberty Title, Skyline Title and GNY Liberty that were to be used to record real estate transactions and mortgages and to pay various transaction taxes and fees, Madden failed to timely and properly record and pay taxes on dozens of mortgages and other real estate transactions.  This exposed his clients to the possible loss of their interests in the properties on which those mortgages were supposed to be filed.

The investigating agent reviewed Liberty Title's, Skyline Title's and GNY Liberty's bank records, which were

primarily held with TD Bank (formerly known as Commerce Bank).
Client funds that were transferred to Liberty Title were wired
or deposited initially into Liberty Title's "Exchange Account,"
and then the funds were transferred into other Liberty Title
accounts, depending on the purpose of the funds.  The same
process took place at Skyline Title and GNY Liberty.

Madden and general counsel for Liberty Title were the
two company executives who were authorized to make wire
transfers from Liberty Title's bank accounts or sign checks on
behalf of Liberty Title.  Upon review of Liberty Title's checks
and interviews with the company's employees, it was revealed
that Madden exercised exclusive control over the finances of
Liberty Title, Skyline Title and GNY Liberty and transferred
money among the companies' accounts as well as to his own bank
accounts through TD Bank's internet banking access website.

Beginning in approximately March 2002, Madden withdrew
several millions of dollars from Liberty Title.  These cash
withdrawals were in addition to his annual salary, which was
$114,000, according to Madden's 2007 tax return.  Over the
years, Madden's cash withdrawals increased from $550,000 in 2005
to $2.2 million in 2008.

9

Between November 3, 2008, and April 6, 2009, on approximately 19 occasions, Madden withdrew a total of approximately $332,000 from Liberty Title's "profits."  These withdrawals were made despite Madden's acknowledgment to an underwriter in correspondence that Liberty Title was facing a difficult financial condition due to the "economic crisis."  At the time, Madden informed his employees that in order to keep the company afloat he would have to dramatically reduce costs, which included salary cuts and reductions in payments to certain employees.

Part of GNY Liberty Title's operating agreement, dated January 2, 2006, precluded Madden from, among other things, incurring any liability for or guaranteeing the debts or obligations of others; entering into any contract not in the ordinary course of the title insurance business; or determining the amount or timing of any distribution to Liberty Agency. Madden signed the operating agreement on behalf of Liberty Title.

Skyline Title also had an operating agreement which prohibited Liberty Title from receiving any payments from

10

Skyline Title, other than as necessary to provide title insurance services to Skyline Title, without first obtaining the consent of the other joint venture partner for Skyline Title. The operating agreement also precluded Liberty Title from borrowing any money in excess of $25,000 a year from Skyline Title on behalf of Liberty Title.

Between April 14, 2008, and March 30, 2009, on at least 15 occasions, substantial sums of money-between $40,000 and $400,000 at a time were transferred from Skyline Title's exchange account or recording account at TD Bank to Liberty Title's exchange account without the authorization of Skyline Title. Most of these transfers were completed online using TD Bank's website.

The case agent's review of Skyline Title's records revealed that, in most months, Liberty Title returned the funds it had misappropriated from Skyline Title. However, after February 2009, Liberty Title did not make Skyline Title whole from its unauthorized transfers. Specifically, in February 2009, approximately $400,000 was transferred from Skyline Title's exchange account to Liberty Title, but only $125,000 was transferred back to Skyline Title by the end of the month. In

11

March 2009, $140,000 was transferred from Skyline Title to Liberty Title, but only $100,000 was returned to Skyline Title.

Misappropriation of EXTEL/IMICO West End LLC's funds

On December 2, 2009, EXTEL/IMICO West End LLC, a large New York City developer, participated in a real estate closing on property located at 531-533 West End Avenue, New York, NY, which involved a mortgage of approximately $135 million. Liberty Title was hired to complete the title work prior to the closing, and the funds for this transaction were wire transferred to Liberty Title on December 2, 2008.  Part of these funds, approximately $2.1 million, was intended to pay off mortgage real estate taxes in connection with the transaction and to record the transaction with the New York County clerk.

On December 4, 2008, the salesperson at Liberty Title who handled the West End Avenue transaction requested a check in the amount of approximately $2.1 million for the payment of the mortgage real estate taxes.  Liberty Title's recording officer sought authorization from Madden to issue the requested check; however, Madden refused to authorize the check.

12

For approximately two months, Madden refused to authorize issuance of the check.  Subsequently, on February 3, 2009, Madden authorized the recording officer to issue the check; however, he instructed the recording officer not to release the check.  Ultimately, the check was released on February 24, 2009; however, there were not sufficient funds in Liberty Title's exchange accounts to cover the issuance of the check.

Therefore, to cover the shortfall, Madden fraudulently transferred to Liberty Title approximately $375,000 from a Skyline Title bank account and approximately $525,000 from a GNY Liberty bank account, of which approximately $500,000 were escrow funds entrusted to GNY Liberty.  Additionally, to provide additional funds needed to cover the $2.1 million check, Madden misappropriated approximately $500,000 that had been entrusted to Liberty Title by a second victim, identified as EXTEL West 57th Street, LLC.  When Liberty Title ultimately collapsed in April 2009, Liberty lacked sufficient funds to repay EXTEL West 57th Street, LLC's purportedly escrowed deposit, as well as other funds entrusted to Liberty, Skyline and GNY by other clients.

13

On April 3, 2009, Liberty Title refused to comply with
EXTEL West End 57th Street, LLC's request to transfer its
$500,000 escrow account to First American Title, another
underwriter.  Madden and one of his attorney's contacted the
salesperson to inform EXTEL West End 57th Street, LLC that a
portion of the $500,000 held in escrow was missing and that
Liberty Title could only wire between $200,000 and $250,000 to
First American Title.

Later that day on April 3, 2009, Liberty Title wire
transferred $250,000 to First American Title.  EXTEL/IMICO West
LLC and First American Title did not receive the remaining
$250,000 that was entrusted to Liberty Title as escrow agent.

Misappropriation of EXTEL West 57th Street, LLC's escrow funds

On February 10, 2009, EXTEL West 57th Street, LLC,
wired approximately $500,000 to Liberty Title's exchange account
in connection with an escrow procedure at 123 West 57th Street
in Manhattan.  Pursuant to an escrow procedure letter, Liberty
Title was to hold $500,000 in a separate money market account
held at TD Bank for the benefit of the parties.  The escrow
procedure letter precluded Liberty Title from disbursing the

14

funds other than under the circumstances specified in the escrow letter.

On February 12, 2009, $500,000 was transferred from Liberty's exchange account to an escrow account.  Subsequently, on February 24, 2009, contrary to the terms of the escrow letter and without the authorization of EXTEL West 57th Street, LLC, the entire $500,000 and interest earned on the deposit was emptied out of the escrow account and deposited back into the exchange account.  Immediately thereafter, the funds were transferred to Liberty Title's "closing account."  The $500,000 escrow was then used to pay a portion of the approximate $2.1 million in real estate taxes and recording fees that Liberty Title owed in connection with the West End Avenue transaction with EXTEL/IMICO West LLC.

Misappropriation of Watchtower Society's escrow funds

On January 23, 2009, the Watchtower Society, a charitable religious organization, executed a wire transfer of approximately $500,000 into Liberty's exchange account pursuant to an escrow agreement dated January 23, 2009.  The funds were to be used solely in connection with the purchase of a parcel of

15

land in Orange County, New York.  The escrow agreement obligated Liberty to hold the money in an interest-bearing escrow account at TD Bank and precluded Liberty from disbursing the funds other than under the circumstances specified in the escrow letter.

After Liberty received the $500,000 deposit, Liberty did not transfer the money to an escrow account as required; instead, the funds were transferred to other accounts. Specifically, between January 26, 2009 and February 2, 2009, three transfers of approximately $300,000 were made from Liberty's exchange account to one of Liberty's operating accounts.  The remaining $200,000 was transferred to Skyline on January 27, 2009, as it was needed to replenish Skyline's exchange account, from which $200,000 had been misappropriated on January 13, 2009.

On April 10, 2009, Watchtower Society wrote to Madden and inquired about the whereabouts of its $500,000 deposit. After receipt of this letter, Madden, thru counsel, refused to confirm the whereabouts of Watchtower Society's funds. According to the case agent, on May 1, 2009, Liberty's exchange account had a balance of $3,169, while the escrow account had a balance of $51.71.

16

Misappropriation of Savannah Partners escrow funds

In connection with the purchase of property located in Orange County, New York, on March 5, 2009, Savannah Partners wired approximately $358,959.85 to Liberty Title's exchange account.  Savannah Partners had previously executed an escrow agreement which required Liberty Title to deposit the funds into a separate interest-bearing account held at TD Bank.  The escrow agreement prohibited Liberty Title from disbursing the funds other than under the circumstances specified in the escrow letter.  However, on March 10, 2009, Savannah Partner's funds were transferred from Liberty's exchange funding account to Liberty's exchange account.  The funds subsequently dissipated.

In April 2009, after First American Title canceled its agency agreement with Liberty Title, it conducted an audit of Liberty Title's operations.  The audit revealed that Liberty Title failed to record deeds and mortgages in connection with over 35 real estate transactions insured by First American Title through its agency agreement with Liberty Title.  As a result, First American covered a shortfall of approximately $200,000 to record these real estate transactions.  It was noted that such

17

fees to pay for the recording of these transactions would have
been provided to Liberty by each of their clients in connection
with these transactions that later went unrecorded.

Reportedly, Madden assured First American Title
auditors that all recordings had been made in a timely fashion;
however, auditors discovered that some of the 35 aforementioned
real estate transactions that were unrecorded were kept in
Madden's office, away from where Liberty Title typically kept
such files.

The case agent reported that one month prior to
Liberty Title's closing, Madden cashed out approximately $96,000
from his personal account at TD Bank into which many of the
withdrawals from Liberty Title had been transferred.
Additionally, in early March 2009, Madden transferred funds from
his and his wife's account to other accounts controlled by
family members, including his daughter.

Specifically, on March 9, 2009, Madden's wife closed
her bank account at Madison National Bank and purchased two bank
checks in the amounts of $101,663.84 and $82,009.76.  That same
day, those two checks were deposited into an account at Capital

18

One Bank in Madden's wife's name.  Subsequently, on March 16, 2009, two cashier's checks in the amount of $152,098 and $100,000 were purchased from Ms. Madden's Capital One Bank account, and both checks were made payable to their daughter, Melissa Madden.  These checks were later deposited into Melissa Madden's Bank of America account.

On March 17, 2009, a certificate of deposit in Ms. Madden's name in the amount of $125,295.75 was withdrawn early from TD Bank.  On March 20 and 24, 2009, a total of $225,000 was withdrawn in cash from Melissa Madden's account.

**The Relevant Statutory Provisions**

For Count 1, pursuant to 18 U.S.C. § 1343, the maximum term of imprisonment is 20 years.  For Count 3, the maximum term of imprisonment is 10 years, pursuant to 18 U.S.C. § 1033(b)(1)(A).

For Counts 1 and 3, if a sentence of imprisonment is imposed, the Court may impose a term of supervised release of not more than three years, pursuant to 18 U.S.C. § 3583(b)(2). Such terms of supervised release are to run concurrently,

19

pursuant to 18 U.S.C. § 3624(e).

For Counts 1 and 3, Defendant is eligible for not less than one nor more than five years' probation by statute, pursuant to 18 U.S.C. § 3561(c)(1).

For Count 1, the maximum fine that may be imposed is between $2 million and $5 million (twice the gross loss), pursuant to 18 U.S.C. § 1343.  For Count 3, the maximum fine that may be imposed is between $2 million and $5 million (twice the gross loss), pursuant to 18 U.S.C. § 3571.  A special assessment of $100 per count is mandatory, pursuant to 18 U.S.C. § 3013.

**The Guidelines**

The November 1, 2010 edition of the United States Sentencing Commission Guidelines Manual has been used in this case for calculation purposes, pursuant to § 1B1.11(a). Following the plea agreement, the Court finds the following with respect to Defendant's applicable offense level, criminal history, recognition of responsibility, and term of imprisonment:

20

Counts 1 and 3 are grouped, pursuant to § 3D1.2(d), because the offense level for each count is determined largely on the basis of the total amount of harm or loss caused by Defendant.

The guideline for a violations of 18 U.S.C. § 1343 and 18 U.S.C. § 1033(b)(1)(A) is found in § 2B1.1(a)(1), which provides a base offense level of seven.

Because the loss that was reasonably foreseeable to Defendant was more than $1 million and less than $2.5 million, a 16-level increase is warranted, pursuant to § 2B1.1(b)(1)(I).

Two levels are added pursuant to § 3B1.3, because Defendant abused a position of private trust or used a special skill in a manner that significantly facilitated the commission or concealment of the offense.

Based on Defendant's written statement and plea allocution, Defendant has shown recognition of his responsibility for the offense.  Pursuant to § 3E1.1(a), the offense is reduced two levels.  Furthermore, an additional one-

21

level reduction is warranted, pursuant to § 3E1.1(b), because Defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the above, the applicable offense level is 22.[1]

---

[1] The PSR found the applicable offense level to be 26.  To reach that number, the Probation Officer found that an 18-level increase was required because Madden is responsible for a loss amount of approximately $4.7 million, pursuant to § 2B1.1(b)(1)(J), rather than a 16-level increase derived from a loss amount of between $1 million and $2.5 million, as set forth in the plea agreement.  The $4.7 million loss total is based on the Indictment, not the charges to which Defendant pled guilty.  The Probation Officer also added a two-level increase based on a finding that Defendant derived more than $1,000,000 in gross receipts from three title companies as a result of the offense, pursuant to § 2B1.1(b)(14)(A).  However, Defendant never allocuted to this charge.

On April 23, 1985, Madden was arrested and charged
with operating a motor vehicle while impaired with alcohol.
Madden pleaded guilty, and, on May 15, 1985, Madden was
sentenced in the Nassau County 1st District Court in Hempstead,
New York to pay a fine of $250, and his driver's license was
revoked.  Pursuant to § 4A1.2(e)(3), this conviction warrants
zero criminal history points.

On June 25, 1997, Madden was arrested and charged with
driving while ability impaired by the consumption of alcohol.
Madden pleaded guilty, and, on March 3, 1998, Madden was
sentenced in the Suffolk County 1st District Court in Central
Islip, New York to a conditional discharge, to pay a fine of
$500, and his driver's license was suspended for 90 days.
Pursuant to § 4A1.2(e)(3), this conviction warrants zero
criminal history points.

On May 19, 1999, Madden was arrested and charged with
driving while ability impaired by the consumption of alcohol.
Madden pleaded guilty, and, on June 2, 2000, Madden was
sentenced in the Suffolk County 1st District Court in Central
Islip, New York to pay a fine of $750, and his driver's license

was revoked.  Pursuant to §§ 4A1.1(c) and 4A1.2(e)(2), this conviction warrants one criminal history point.

A total of one criminal history point establishes a Criminal History Category of I, pursuant to the table at Chapter 5, Part A, of the Guidelines.

Based on a total offense level of 22 and a Criminal History Category of I, the Guidelines range for imprisonment is 41 to 51 months.

Supervised release is required if the Court imposes a term of imprisonment of more than one year or when required by statute, pursuant to § 5D1.1(a).  The Guidelines range for a term of supervised release is two to three years, pursuant to § 5D1.2(a)(2).

Defendant is not eligible for probation because the applicable guideline range is in Zone D of the Sentencing Table, pursuant to § 5B1.1, Application Note #2.

The fine range for the instant offense is $7,500 to $75,000, pursuant to § 5E1.2(c)(3)(A) and (c)(4)(A).  Subject to

Defendant's ability to pay, in imposing a fine, the Court shall
consider the expected costs to the Government of any
imprisonment, probation, or supervised release pursuant to
§ 5E1.2(d)(7).  The most recent advisory from the Administrative
Office of the United States Courts suggests a monthly cost of
$2,270.93 to be used for imprisonment, a monthly cost of $317.32
for supervision, and a monthly cost of $2,063.19 for community
confinement.

**The Remaining Factors of 18 U.S.C. § 3553(a)**

          Having engaged in the Guidelines analysis, this Court
also gives due consideration to the remaining factors identified
in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not
greater than necessary," as is required by the Supreme Court's
decision in Booker, 543 U.S. 220, and the Second Circuit's
decision in Crosby, 397 F.3d 103.  In light of the Court's
statutory responsibility "to 'impose a sentence sufficient, but
not greater than necessary' to accomplish the goals of
sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007)
(quoting 18 U.S.C. § 3553(a)), and having considered the
Guidelines and all of the factors set forth in § 3553(a), it is
determined that a Guidelines sentence is warranted in the

instant case.[2]


**The Sentence**


For the instant offense, Madden will be sentenced to 41 months' imprisonment and 2 years' supervised release.

---

[2] The Guidelines range based on an offense level of 22 is significantly lower than it would be under the PSR's offense level of 26.  To the extent that this may be construed as a downward departure, it is justified by the terms of the plea agreement and the nature and circumstances of the offense.  See 18 U.S.C. § 3553(a).  In this case, justice requires the Court to respect the terms of the plea agreement and sentence Madden in accordance with them.

Madden is directed to report to the nearest United States Probation Office within 72 hours of release to commence his term of supervised release.  It is recommended that Madden be supervised by the district of his residence.

As mandatory conditions of his supervised release, Madden shall:  (1) not commit another federal, state, or local crime; (2) not illegally possess a controlled substance; (3) not possess a firearm or destructive device; (4) cooperate in the collection of DNA as directed by the probation officer; (5) Defendant shall refrain from any unlawful use of a controlled substance; and (6) Defendant shall submit to one drug testing within 15 days of placement on probation or supervised release and at least two unscheduled drug tests thereafter, as directed by the probation officer.

Furthermore, the standard conditions of supervision (1-13), set forth in the judgment, shall be imposed with the additional special conditions:

(1)   Defendant shall provide the probation officer with access to any requested financial information.

(2)   Defendant shall not incur new credit charges or open

27

additional lines of credit without the approval of the probation officer unless Defendant is in compliance with the installment payment schedule.

In consideration of the significant amount of restitution and forfeiture Defendant will be paying, the fine in this case shall be waived.

A special assessment of $200, payable to the United States, is mandatory and shall be due immediately.

An Order of Restitution will be delayed for up to 90 days after the sentence is imposed in anticipation of receiving the necessary identifying information from the Government pursuant to the provisions of 18 U.S.C. § 3664(d)(5).

If Defendant is engaged in a BOP non-UNICOR work program, Defendant shall pay $25 per quarter toward the criminal financial penalties.  However, if Defendant participates in the BOP's UNICOR program as a grade 1 through 4, Defendant shall pay 50 percent of his monthly UNICOR earnings toward the criminal financial penalties, consistent with Bureau of Prisons regulations at 28 C.F.R. § 545.11.

The balance shall be paid in monthly installments of 20

percent of gross monthly income over a period of supervision to commence 30 days after the date of the judgment or the release from custody if imprisonment is imposed.

Defendant shall notify the United States Attorney for this district within 30 days of any change of mailing or residence address that occurs while any portion of the restitution remains unpaid.

Madden shall forfeit to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982, and 28 U.S.C. § 2461, all property constituting proceeds from the offense.  If any of the property subject to forfeiture cannot be located upon the exercise of due diligence, has been transferred to a third party, has been placed beyond the Court's jurisdiction, has been substantially diminished in value, or has been commingled with other property, Madden shall forfeit any other property of his up to the value of the forfeitable property, pursuant to 18 U.S.C. § 982(b) and 21 U.S.C. § 853(p). Defendant's forfeiture includes but is not limited to the following:

- the real property and appurtenances thereto known as 2820 Shipyard Lane, Unit 2G2 East Marion, N.Y.;

- the real property and appurtenances thereto known as 95 Caiola Court, Greenport, N.Y.;[3]

---

[3]  It is the understanding of the parties that upon the sale of the property at 95 Caiola Court, Greenport, N.Y., one-half of the net profits from the sale are to be provided to Elizabeth D. Madden, consistent with the Stipulation and Order entered between the Government, Elizabeth D. Madden, and Melissa K. Madden.

- the real property and appurtenances thereto known as 236 East 47th Street, Apt. 19E, New York, N.Y.;

- the real property and appurtenances thereto known as 265 Bay Avenue, Huntington Bay, N.Y.;

- all funds and money that GNY Liberty Abstract, LLC owes to Brian H. Madden, Liberty Title Agency, LLC, and/or Liberty Agency Holdings, LLC, including but not limited to approximately $1.2 million held in escrow by GNY-Liberty Abstract, currently in the possession of the law firm of Kramer, Levin, Naftalis & Frankel LLP;

- all funds and money held in Investment Account No. 4PQ-002215, in the name of Brian H. Madden, at Devenir Group Wealth Management (estimated at approximately $494,000, as of November 1, 2010);

- all funds and money owed by the Treeline Companies to Brian H. Madden and/or Liberty Title Agency, LLC, including but not limited to approximately $60,000 retained as a security deposit for property leased by Liberty Title Agency, LLC;

- approximately $50,000 currently in the possession of Frederick Phillip Hafetz, Esq.;

- any and all funds and money maintained in any bank account in the name or for the benefit of Liberty Title Agency, LLC, and/or Liberty Agency Holdings, LLC.

- any and all securities and options owned by or for the benefit of Brian Madden, including but not limited to shares and options Brian Madden possesses in Bovie Medical Group, Aris, Legacy Funding Group, Madison National Bank, Signature Miller, and Paleon Oil & Gas.

- all cash seized by law enforcement, on or about May 19, 2009, from the residence located at 97 Sharon Lane, Greenlawn, New York during a court-authorized search of the residence, including approximately $108,610 in United States Currency;

- Any and all cashier's checks seized by law enforcement, on or about May 19, 2009, during a court-authorized search of the residence located at 97 Sharon Lane, Greenlawn, New York, including but not limited to the following checks[4]:

  (i)   check number 3397233 issued by Bank of America in the amount of $100,151.89 in the name of "Melissa K. Madden,"

  (ii)  check number 3397234 issued by Bank of America in the amount of $125,162.74 in the name of "Melissa K. Madden,"

---

[4] It is the understanding of the parties that upon transfer of the cashier's checks to the Government, and the Government successfully redeeming the checks for cash for the total face value amount of the cashier's checks, the Government shall provide $170,000 to Melissa K. Madden, consistent with the Stipulation and Order entered between the Government, Elizabeth D. Madden, and Melissa K. Madden.

31

        (iii) check number 8000515260 issued by
Capital One Bank in the amount of
$152,098.00 in the name of "Melissa K.
Madden,"

        (iv)  check number 10120288 issued by Apple
Bank in the amount of $15,000.00 in the
name of "Melissa K. Madden,"

        (v)   check number 10120287 issued by Apple
Bank in the amount of $5,688.27 in the
name of "Melissa K. Madden."

- Any and all funds and other assets held in the
following accounts:

        (i)   Bank Account No. 7916817401, in the
name of Brian H. Madden, held at TD
Bank;

        (ii)  Bank Account No. 300000775, in the name
of Brian H. Madden, held at American
Community Bank;

        (iii) Bank Account No. 7926374096, in the
name of Brian H. Madden and Elizabeth
Madden, held at TD Bank

The terms of this sentence are subject to modification
at the sentencing hearing scheduled for September 20, 2011.

It is so ordered.

New York, NY
September 19 , 2011

_____
ROBERT W. SWEET
U.S.D.J.

32